Filed 9/27/16

**CERTIFIED FOR PUBLICATION**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

**(Butte)**

----

| | |
|---|---|
| THE PEOPLE, | C080545 |
| Plaintiff and Respondent, | (Super. Ct. Nos. APP 3985, SCR77709) |
| v. | |
| KENNETH RALPH DAVIS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Appellate Division of the Superior Court of Butte County, Robert A. Glusman, Clare Keithley, and Tamara L. Mosbarger, Judges. Reversed in part and affirmed in part.

Charles M. Bonneau, Jr., for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Jeffrey Grant, Deputy Attorneys General, for Plaintiff and Respondent.

In February 2014, a jury found defendant Kenneth Ralph Davis guilty of two 2010 misdemeanors, diverting the natural course of a stream (Fish & G. Code, § 1602—count

1

2) (acquitting him of obstructing it in count 1) and petty theft (of water) (Pen. Code, § 488—count 3).[1] It also found him guilty of a trespass injuring wood or timber in 2010 in another case (which was consolidated solely for purposes of trial) that involved a road he had bulldozed across neighboring property to his own. (§ 602, subd. (a).) The court placed him on a three-year period of informal probation, conditioned on a 90-day jail term.

Defendant sought review of his convictions in the Appellate Division of the Butte County Superior Court. (§ 1466, subd. (b)(1).) The appellate division issued an opinion in October 2015 that affirmed the judgments (Butte County Super. Ct. No. APP 3985). On defendant's request, it then certified the case for transfer. (Cal. Rules of Court, rule 8.1005(b).) We ordered transfer to this court solely on the issue of whether defendant could be prosecuted and convicted of *petty theft* of water. (*Id.*, rules 8.1008(a), 8.1012(e)(1).)

Defendant asserts there cannot be a theft in this case as a matter of law because the natural stream at issue was nuisance groundwater that the owner was diverting from its property, and the State of California has only a regulatory interest in use of these public waters that otherwise are not personalty that can be the subject of a larceny. We agree that there cannot be a simple larceny of uncaptured flowing water. We thus reverse his conviction for petty theft with directions to dismiss that count.

### FACTUAL AND PROCEDURAL BACKGROUND

As the result of a complaint from a neighbor in September 2009 about defendant maintaining a field of marijuana and diverting water from a stream, a deputy assigned to the Yankee Hill area of the county (located between State Route 70 and the Rich Gulch arm of Lake Oroville) went to defendant's home. The deputy knew of the cultivation of

---

[1] Undesignated statutory references are to the Penal Code.

marijuana, having conducted several checks of the field for compliance with medical use. He asked defendant whether he was taking water from a stream. Defendant denied doing this, showing the deputy the well on the property that supplied water.

The neighbor told the deputy that defendant was lying, and in January 2010 took the deputy to the location of the makeshift well. About 130 feet north of train tracks, on what was Union Pacific Railroad (Union Pacific) property, there was a 2,500-gallon tank embedded in a large hole in the ground. Only the top of the tank was visible. It appeared that almost the entirety of water that was flowing from a train tunnel for about 80 feet along the north side of the tracks was being captured in a large PVC pipe to fill the tank. Some of the water continued spilling down what looked like it had been the water's previous streambed, which led to Rich Gulch. Rich Gulch (in which water flowed intermittently to Lake Oroville) ran under the train tracks through a culvert about 100 feet away and 30 feet lower. A makeshift electrical panel powered a submersible pump in the bottom of the tank that sent the water in the tank uphill through more PVC piping to the marijuana field.

In February 2010 the deputy returned with a warden from the Department of Fish and Game (now the Department of Fish and Wildlife).[2] The deputy took photographs of the site, and the warden took videos. The warden identified riparian vegetation both above and below the diversion that would require a constant water supply, and therefore considered the watercourse to be a stream flowing to Rich Gulch that was accordingly subject to state regulation. Only a small amount of water was flowing below the

---

[2] In 2012 section 700 of the Fish and Game Code was amended to change the name of the Department of Fish and Game to the Department of Fish and Wildlife; any references herein are to this department. (Fish & G. Code, § 700, subd. (c), as amended by Stats. 2012, ch. 559, § 8, eff. Jan. 1, 2013.)

diversion at this point. The warden had not seen the site previously. Defendant did not have permission from the state for the diversion.

A Union Pacific agent testified that he went to the diversion site in July 2010, where he saw a tank buried in the ground in the middle of "a waterway that actually ran down the hill toward a ravine" (presumably Rich Gulch). Defendant did not have the permission of the railroad for this diversion of water on its property.

The train tunnel was built with a drainage system to relieve hydrostatic pressure from an aquifer in the hill above it. This collected the percolating water and discharged it through the tunnel's entrance on both sides of the tracks, a sluice box diverting water on the south side to the north side. There is also water flowing along the south side down toward Rich Gulch (which is not at issue). The system is designed to prevent erosion of the tracks. The water is grayish, presumably because it percolates through concrete.

The prosecution's expert hydrologist (a commissioner on the Butte County Water Commission) first investigated the site in September 2012 after the removal of the tank. Water flowed from the tunnel to a trench, where it seeped into the ground; the soil was very porous at the site. As there was still 2.2 cubic feet (about 16 gallons) per second of water flowing even at summer's end, the hydrologist believed this water flowed year round. It appeared that the water used to flow below the diversion site because water-loving plants had grown below it, and thus he believed it was a tributary of the Rich Gulch streambed (which was dry north of the culvert at the time of his visit), but he otherwise did not have any way to confirm this opinion.

Both in his testimony and in a discussion in the summer of 2010 with the district attorney and the deputy sheriff, defendant asserted that he had thought the diversion site was his property. A tenant was maintaining the marijuana field. The wells on the property were inadequate for growing the plants (in his opinion because the water pressure was leaking out through the train tunnel underneath it). Defendant offered to

4

install a tank that the tenant provided and set up the pumping system. He claimed the water ran onto the site at five gallons per minute (about 0.68 cubic feet), and seeped into the ground without flowing downhill except during torrential rain. At trial, he denied concealing the existence of the diversion from the deputy.

Defendant's expert hydrogeologist also first examined the site in 2012. He concluded that there had not been an established waterway; the water percolated in the tunnel, then drained via Union Pacific's engineered system to the diversion site, where it ponded and seeped into the very porous soil without going further. He based his conclusion on the representations defendant made to him. If there was evidence that the water had flowed down to Rich Gulch, he would change his opinion about it being a natural waterway.

The sole closing argument regarding theft came from the prosecution: "In this case I have to prove beyond a reasonable doubt that the defendant took possession of water, and it belonged to someone else. Well, who owns the water? We all own the water. But we don't get to do whatever we want with it. As people who live in the State of California, we have entrusted the water to the Department of Fish and Game. They control it on our behalf. They're the ones who give us permission to use it. And so, in terms of the defendant not having consent, he would have to get the permission from Fish and Game. They ultimately have the control over how our water is [used]. And we know he did not have the consent of the Department of Fish and Game to use this water." Defense counsel argued generally that this was discarded water that seeped into the ground without forming a natural waterway.

The court instructed on the requirements for finding the water flow at issue to be a natural stream connecting with the waterways of the state. In connection with theft, it instructed, "The fish and wildlife resources of this state are owned by the people of

5

the State of California and held in trust for the people of the state, by and through the Department of Fish and Game."

## DISCUSSION

As an essential element of larceny, there must be personal property that is subject to ownership. (2 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Crimes Against Property, § 17, p. 41.) It is sufficient for a victim to have a possessory interest in an item superior to the defendant, regardless of the actual form of legal title. (*People v. Smith* (2009) 177 Cal.App.4th 1478, 1491; *People v. Brunwin* (1934) 2 Cal.App.2d 287, 296 (*Brunwin*).)

Defendant contends, however, that the State of California does not have *any* possessory interest in the waters of the state (other than such riparian or appropriative rights it acquires under law), putting primary reliance on *State of California v. Superior Court* (2000) 78 Cal.App.4th 1019 (*State of California*). The People concede the state does not "own" the water, but assert the state's authority over waterways is sufficient to establish this element because this demonstrates defendant's *absence* of a possessory interest. We must agree with defendant.

Water is a resource for which "[o]wnership . . . is vested [collectively] in the state's residents . . . ." (*Millview County Water Dist. v. State Water Resources Control Bd.* (2014) 229 Cal.App.4th 879, 888). "Hence, the cases do not speak of the ownership of water, but only of the right to its use." (*United States v. State Water Resources Control Bd.* (1986) 182 Cal.App.3d 82, 100.) The public trust doctrine (dating to Roman law) rests on the need for the public's unfettered access to a " 'gift[] of nature's bounty' " like water, such that private property rights are not recognized in the resource; " 'the rule of water law [is] that one does not own a property right in water in the same way [one] owns [a] watch or . . . shoes, but . . . only [a] usufruct—an interest that incorporates the needs of others.' " (*Zack's, Inc. v. City of Sausalito* (2008) 165 Cal.App.4th 1163, 1175-

6

1176; cf. *National Audubon Society v. Superior Court* (1983) 33 Cal.3d 419, 436 [public trust applies to diversions from nonnavigable tributaries of navigable waters].)  Indeed, a resource subject to a public trust is considered *inalienable*, such that the state could not grant a property right in it:  " 'The ownership of the navigable waters of the harbor and of the lands under them is a subject of public concern to the whole people of the State.  The trust [in] which they are held, therefore, is governmental and cannot be alienated . . . .' " (*National Audubon*, *supra*, 33 Cal.3d at p. 438.)

*State of California* makes clear that the state in its role as public trustee does not have any *proprietary ownership* of public waters, beyond any riparian or appropriative rights it might acquire as a property owner.  (*State of California*, *supra*, 78 Cal.App.4th at pp. 1022, 1030 & fn. 16 [state does not own groundwater for purposes of exclusionary clause in insurance policy].)

A characterization of a state as a "trustee" is merely a legal fiction of the 19th century expressing the state's police power over its resources.  (*People v. Brady* (1991) 234 Cal.App.3d 954, 958 (*Brady*).)  In actuality, these resources do not have *any* owner until lawfully captured, at which point they become the personal property of the captor. (*Ibid.* [wild creatures are not subject to private ownership]; *Siskiyou County Farm Bureau v. Department of Fish & Wildlife* (2015) 237 Cal.App.4th 411, 447 [water belongs "to the people" and does not become property of any individual user unless lawfully captured]; *State of California*, *supra*, 78 Cal.App.4th at p. 1026 [" 'The People['s]' " ownership of water does not authorize individual Californians to take water without right]; *Fullerton v. State Water Resources Control Bd.* (1979) 90 Cal.App.3d 590, 598 [no private property interest in corpus of flowing water] (*Fullerton*); see *Strawberry Water Co. v. Paulsen* (Ariz.Ct.App. 2008) 220 Ariz. 401, 407 [207 P.3d 654, 660] [no right of ownership in water until lawful withdrawal from common supply] (*Strawberry Water Co.*); *Clark v. State* (Okla.Crim.App. 1917) 170 P. 275, 276 [running water often compared "to wild

animals, birds, and fishes, which, before capture and confinement, belong to no one, but after capture belong to [those] who capture[] them"].)  If the captor releases the water, " 'the water becomes again nobody's property.' "  (*Strawberry Water Co.*, *supra*, 220 Ariz. at p. 407.)**3**

As a result, at common law there could not be larceny of public resources because these are not anyone's personal property.  (*Brady*, *supra*, 234 Cal.App.3d at p. 958-960 [abalone in public water not anyone's personal property, taking of wild creature thus cannot be a larceny; legislative history indicates an express intent to preserve rule of common law, limiting larceny to marine *products* of aquaculture]; 3 Wharton's Criminal Law (15th ed. 2015) § 371, p. 439 [though stored water could be subject of larceny at common law, "running water could not"].)  Similar to *Brady*, the only larceny provision expressly premised on taking water involves theft of water as the captured *product* of a utility company, along with gas and electricity.  (§ 498; see *Ex parte Helbing* (1884) 66 Cal. 215, 215-216 [involving predecessor statute limited to water companies].)  While the People may prosecute defendant for transgressing the state's regulatory police power (*Brady*, *supra*, 234 Cal.App.3d at pp. 961-962), they do not provide any authority to counter the above stated principle that their ability to regulate his behavior does not create any possessory interest in the water that constitutes larceny.  Consequently, this was an invalid legal theory on which to premise defendant's larceny conviction.**4**

---

**3** In an aside, defendant suggests the water flow did not have any inherent value because Union Pacific was discarding it.  (*People v. Cuellar* (2008) 165 Cal.App.4th 833, 837 [item must have intrinsic value to sustain charge of petty theft].)  It is beyond dispute that the water had inherent value to the marijuana growers.  However, the point is ultimately irrelevant.  Discarding the water is not relevant to its lack of value to the railroad, it is relevant to whether any water was personalty of Union Pacific through capture.

**4** We note that the interference with Union Pacific's riparian water right cannot of itself be a basis for larceny because it is a form of realty, not personalty.  (*Fullerton*, *supra*,

But this is not the end of the analysis. The People allude to section 495, which categorizes the severance of real property interests as a larceny, and *Brunwin*, *supra*, 2 Cal.App.2d 287 (severance of oil), and contend defendant's actions came within the meaning of this statute. Other than refer to *Brady*, which is inapposite because no analogous "severance" statute exists with respect to wild creatures on the property of another, defendant does not address section 495.

To get our metaphysics up and running, there is no ownership of water, gas, or oil on the land other than in usufruct. (13 Witkin, Summary of Cal. Law (10th ed. 2005), Personal Property, § 1, p. 15; 12 Witkin, *supra*, Real Property, § 792, p. 921; § 917, pp. 1106-1107.) Water in its natural state is categorized as a type of real property until severed from the realty "and confined in portable receptacles," at which point the water transmutes to personal property. (*Stanislaus Water Co. v. Bachman* (1908) 152 Cal. 716, 725 (*Stanslaus Water Co.*); 13 Witkin, *supra*, Personal Property, § 91, p. 113.) Water that is diverted for purposes of *irrigation*, however, "is not deemed severed and thus remains [realty]" (13 Witkin, *supra*, § 91, p. 113); "In the case of water for irrigation, delivered in ditches or pipes, the severance *does not take place at all*" (*Copeland v. Fairview Land & Water Co.* (1913) 165 Cal. 148, 154, italics added (*Copeland*); accord, *Stanislaus Water Co.*, *supra*, 152 Cal. at pp. 726-727 [wrongful diversion of water is injury to realty].)

In a usually overlooked part of *People v. Dillon* (1983) 34 Cal.3d 441 (*Dillon*)—in contrast with the always distinguished holding that the imposition of life punishment on the defendant for first degree murder was constitutionally disproportionate under the facts of that case (*id*. at p. 489)—it discussed the evolution of severance of realty as a basis for larceny. Originally, in "a hypertechnical remnant of an archaic formalism that can no

90 Cal.App.3d at p. 598; see *Strawberry Water Co.*, *supra*, 220 Ariz. at p. 406 [same rule for tort of conversion].)

9

longer be seriously defended" (*id*. at p. 457), the common law limited larceny to personal property because land could not be asported.  However, as the definition of real property broadened, it began to include "many items that can be more or less readily detached and removed from the land."  (*Ibid*.)  Given a reluctance to expand the class of offenses then subject to capital punishment, courts "clung to the artificial distinction" between personalty and realty, and developed the principle that severed realty (which ordinarily *would* become personalty had the landowner accomplished it) asported in a single transaction with the severance never became the owner's personalty, so a larceny did not take place.  (*Ibid*.)  "Thus, in a perverse and unintended application of the work ethic, thieves industrious enough to harvest what they stole and to carry it away without pause were guilty at most of trespass, while those who tarried [before returning to take it away] or enjoyed fruits [severed by others], faced the hangman's noose."  (*Id*. at p. 458.)

*People v. Williams* (1868) 35 Cal. 671 confessed "we do not comprehend the force of these distinctions . . . .  The more sensible rule . . . would [be], that by the act of severance the thief had converted the property into a chattel; and if he then removed it . . . he would be guilty of a larceny . . . ."  (*Id*. at p. 676.)  It nonetheless considered itself bound under the common law to preserve the distinction, imploring the Legislature to change the rule.  (*Id*. at pp. 676-677.)  It thus upheld the dismissal of an indictment for grand larceny that did not make clear whether the defendant severed 52 pounds of gold-bearing quartz rock from the lode in the victim's mine, or whether he carried away already severed rock.  (*Id*. at pp. 673-674, 677.)

In enacting the Penal Code, the Legislature responded.  Section 495 abrogated the common law, redefining detachable realty "as personalty subject to larceny, 'in the same manner as if the thing had been severed by another person at some previous time.' "  (*Dillon*, *supra*, 34 Cal.3d at p. 458.)  It also enacted what are now sections 487b and 487c dividing the crime of larceny by severance into grand and petty theft.  (*Dillon*, at p. 458.)

10

Because "the rule requiring an interruption between severance and asportation has suffered such erosion and criticism . . . that we no longer feel compelled to preserve it" (*Dillon*, *supra*, 34 Cal.3d at p. 459) and the generally accepted modern rule is to the contrary (*id*. at p. 460; see 3 LaFave, Substantive Criminal Law (2d ed. 2003) Theft, § 19.4(a), p. 79 [trend in modern criminal codes to include any sort of property capable of being moved, even those "savoring of real property"]), *Dillon* refused to extend the principle to the new context of robbery, and thus the severed marijuana was properly the basis of the defendant's conviction for attempted robbery (*Dillon*, at pp. 461-462).

*Brunwin* is the only other case we have been able to identify in which larceny by severance was at issue. The information alleged that the defendants had entered onto the victim's land and severed 1,004 barrels of oil valued at $572.28, and carried it away. (*Brunwin*, *supra*, 2 Cal.App.2d at p. 289.) The trial court sustained a demurrer on the ground the facts did not constitute a public offense, the defendants arguing that larceny of realty "is unknown to the law." (*Ibid*.) *Brunwin* concluded section 495 was not limited to fixtures, but applied to anything forming a part of the realty that is severed and taken. (*Brunwin*, at pp. 290-291.) Whatever the exact nature of the possessory right to extracted oil, it was sufficient to support larceny by severance. (*Id*. at pp. 298-299.)

In accordance with the adage that water and oil do not mix, *Brunwin* is not of any succor to the People. While, as we have noted, the *identity* of the actual owner is not an element of larceny (*People v. Melson* (1927) 84 Cal.App. 10, 20-23 [name of owner of stolen property merely serves to identify transaction at issue to facilitate any subsequent plea of double jeopardy]; accord, *People v. Nunley* (1904) 142 Cal. 105, 107-110; *People v. Price* (1941) 46 Cal.App.2d 59, 62 ["It is . . . a matter of no concern to a thief" that legal title to stolen property is not in the complainant]; *People v. Larrabee* (1931) 113 Cal.App. 745, 747-748), and the exact *nature* of the superior possessory interest is also immaterial (*Brunwin*, *supra*, 2 Cal.App.2d at p. 296), there must *be* a superior

11

possessory interest of some kind. Unlike crops or oil, individual particles of water flowing upon one's realty are not personalty unless captured. (*Palmer v. Railroad Com. of California* (1914) 167 Cal. 163, 168; *San Bernardino Valley Municipal Water Dist. v. Meeks & Daley Water Co.* (1964) 226 Cal.App.2d 216, 221.) As the railroad had not itself captured any of the flowing water, and the creation of an irrigation system would not have effected a severance from realty had the railroad accomplished it (*Copeland*, *supra*, 165 Cal. at p. 154), a possessory interest superior to defendant did not exist when he diverted the water from the railroad's realty, and section 495 accordingly cannot apply as an alternative basis for this count.

### DISPOSITION

The conviction for petty theft (count 3) is reversed, with direction to dismiss the count. The judgment is otherwise affirmed. The trial court shall prepare an amended probation order and issue such corrected minute orders as necessary. (***CERTIFIED FOR PUBLICATION***)


                                     BUTZ         , J.


We concur:


     BLEASE        , Acting P. J.


     MAURO        , J.