Filed 3/14/25

<u>**CERTIFIED FOR PARTIAL PUBLICATION**</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| SANDTON AGRICULTURE INVESTMENTS III, LLC, et al. | F086484 |
| Plaintiffs, Cross-defendants, and Respondents, | (Super. Ct. No. 21CV-02712) |
| v. | |
| 4-S RANCH PARTNERS, LLC, | **OPINION** |
| Defendant, Cross-complainant, and Appellant. | |

-ooOoo-

APPEAL from a judgment of the Superior Court of Merced County. Brian L. McCabe, Judge.

Gilmore Magness Janisse, Christopher E. Seymour; Klein, DeNatale, Goldner, Cooper, Rosenlieb & Kimball and Catherine E. Bennett for Defendant, Cross-complainant and Appellant.

Wanger Jones Helsley, Kurt F. Vote, John P. Kinsey and Steven K. Vote for Plaintiffs, Cross-defendants and Respondents.

-ooOoo-

---

\*      Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part III.

In this appeal, a borrower that lost its 5,257-acre ranch in a nonjudicial foreclosure sale asks us to be the first California appellate court to recognize that water in an aquifer can be personal property. The borrower contends approximately 500,000 acre-feet of captured floodwaters stored in the aquifer under the ranch is personal property that it still owns because the foreclosure sale transferred only real property to the lender. The lender disagrees, contending it acquired the rights to the water because those rights were appurtenant to and ran with the land. To resolve the dispute, the lender filed a declaratory relief action.

The trial court granted the lender's motion for summary adjudication, concluding (1) the water was not personal property owned by borrower and (2) the rights to use of the water ran with the land and, thus, the lender acquired those rights at the foreclosure sale. We agree. Under California water law, allowing water to seep into an aquifer changes its legal classification to percolating groundwater, regardless of whether it was previously classified as floodwater or personal property. Percolating groundwater is in a "natural state" and, as such, "is part of the land." (*Copeland v. Fairview Land & Water Co.* (1913) 165 Cal. 148, 154 (*Copeland*).) Thus, summary adjudication of the lender's declaratory relief claim was proper.

In the unpublished part of this opinion, we conclude the trial court properly sustained the lender's demurrers to the seven causes of action alleged in the borrower's cross-complaint.

We therefore affirm the judgment.

## FACTS

Plaintiffs and cross-defendants Sandton Credit Solution Master Fund IV, LP and Sandton Agricultural Investments III, LLC, a Delaware limited liability company, are referred to collectively as Sandton in this opinion. Cross-defendant WT Capital Lender Services, a California corporation, is not a party to this appeal; it conducted the foreclosure sale and executed the trustee's deed upon sale challenged in this case.

2.

Defendant and cross-complainant 4-S Ranch Partners, LLC (4-S) is a Delaware limited liability company with its principal place of business in Merced County. Stephen W. Sloan has been the sole managing member of 4-S since its formation in 2013.

In 2009, another company owned and operated by Sloan, Merced Falls Ranch, LLC, paid $11.5 million for land consisting of 17 assessed parcels and containing approximately 5,257.46 acres (Land) and related interests. In 2013, 4-S acquired legal title to the Land and related interests.

In October 2019, the Land and attached improvements (described as a modest set of corrals) were appraised at $14,985,000. The appraisal was commissioned by Sandton and excluded any subsurface water or mineral rights. The appraisal stated that, due to two perpetual United States Fish & Wildlife conservation easements, the Land was limited to its current use as an irrigated and dry pasture ranch with some lower intensity farming uses, such as growing wheat, barley and alfalfa.

*The Easements*

In 1960, the Land's owner and the Sacramento and the San Joaquin Drainage District (District) entered into an easement agreement (District Easement) allowing water flows through two San Joaquin River bypasses—the East Side Bypass and the Mariposa Bypass—to seep into and sometimes inundate the Land. The District Easement authorizes the District to construct, enlarge, operate and maintain various levees and incidental works that are part of a flood control project for the San Joaquin River and provides the District is not liable for any damage resulting from any water inundating the Land.

In July 2013, Merced Falls Ranch, 4-S's immediate predecessor in interest, and the United States Department of the Interior, Bureau of Reclamation (Reclamation) entered into a "*GRANT OF EXCLUSIVE FLOOD/FLOWAGE EASEMENT*" (Reclamation Easement) relating to the East Side Bypass and the Mariposa Bypass. It granted Reclamation "the permanent right to overflow, flood, submerge, and convey Interim and

3.

Restoration Flows and refuge water supply flows on, over, through, and across the" Land. "Interim and Restoration Flows" were defined in the Reclamation Easement as increased releases of water from the Friant Dam to the confluence of the Merced River for the purpose of restoring and maintaining fish populations in good condition. The flows were required by a stipulated settlement of a federal lawsuit. The term "refuge water supply" was defined as water acquired by Reclamation for delivery to certain wetlands in wildlife refuges.

The Reclamation Easement reserved to Merced Falls Ranch, the grantor "the right to divert and utilize flood flows and other flows from the Channel except for Interim and Restoration Flows and refuge water supply, which Grantor shall not divert under any circumstances. Nothing in this document shall be deemed a conveyance of such reserved rights by Grantee or an admission by the Grantee that such reserved rights exist." It also provided: "The reserved rights of Grantor shall include without limitation the unrestricted right of Grantor to pump water from wells and discharge such water into the Channel. Such discharges may occur in such amounts, at such times and in such manner as Grantor may determine in Grantor's sole and absolute discretion regardless of whether Interim or Restoration Flows are present in the Channel provided that Grantor shall not cause the carrying capacity of the Channel to be exceeded." Reclamation and the grantor agreed to communicate, coordinate and cooperate to facilitate the grantor's deliveries of well water downstream to third parties.

In August 2014, 4-S and the Del Puerto Water District entered into a water transfer agreement under which 4-S agreed to sell up to 11,000 acre-feet of water per year for a two-year period. The price was $600 per acre-foot for transfers using the Patterson Irrigation District's diversion facilities and $750 per acre-foot for transfers not using those facilities. The agreement generated $7.8 million per year. The transfers were allowed after Governor Brown declared a state of emergency because of drought.

In his declaration, Sloan stated that from 2009 to 2021, pursuant to the easement agreements, 4-S and its predecessor (1) allowed floodwater from the East Side Bypass and the Mariposa Bypass to inundate the Land and (2) took possession and control of those waters, allowing them to seep into the shallow aquifer underneath the Land for storage and later extraction for sale to third parties. Sloan's declaration asserted that in March 2020, 4-S had a total inventory of 500,000 acre-feet of water stored in the aquifer under the Land;[1] its value at the time was $400 per acre-foot for a total of $200 million; and the water's value had risen to $1,200 to $1,600 per acre-foot by September 2022 and, thus, totaled no less than $600 million.

*The Loan and Deed of Trust*

In August 2017, Sandton loaned 4-S approximately $33 million. Sandton and 4-S executed a loan agreement defining their rights and obligations related to the loan. 4-S secured the loan by executing a "DEED OF TRUST, SECURITY AGREEMENT, AND FIXTURE FILING WITH ASSIGNMENT OF RENTS AND PROCEEDS, LEASES, AND AGREEMENTS" (Deed of Trust) granting Sandton the benefit of all of 4-S's right, title and interest in various property.

The collateral included the Land, improvements, leases, rents and proceeds, and "Water Rights" (Property). The term "Water Rights" was defined as "all of [4-S's] right, title and interest in all water (including any water inventory in storage), water rights and entitlements, other rights to water and to receive water, and water rights of every other kind or nature, that serve the Land, including, without limitation, stored water, groundwater, surface water, riparian rights, drainage rights, and all rights to obtain water from governmental water district and non-governmental water companies including

---

[1]     If the stored water were brought to the surface and confined within the Property's boundaries, it would average over 95 feet deep.

rights under groundwater sustainability or management plans and related judicial or administrative decisions."

*UCC Financing Statement*

In addition to recording the Deed of Trust, Sandton filed a "UCC FINANCING STATEMENT" with the Delaware Department of State in August 2017. The financing statement listed 4-S as the debtor, Sandton as the secured party, and the collateral as including all farm products, all equipment used in connection with the "Real Property," all contracts for the sale of irrigation water and related proceeds, various goods (whether fixtures or personal property), and nine categories of "Water Assets" associated with the "Real Property."

The financing statement defined "Real Property" using the legal descriptions and the assessor's parcel numbers for the Land. The paragraph describing the water assets began: "All right, title and interest at any time of [4-S] …, associated with the Real Property, whether now existing or hereafter arising or acquired, whether direct or indirect, whether owned legally, of record, equitably or beneficially, *whether constituting real or personal property (or subject to any other characterizations)*, whether created or authorized under existing or future laws or regulations, and however arising, including, without limitation, the following (collectively, 'Water Assets'): (i) all water (including any water inventory in storage), water rights and entitlements, other rights to water and other rights to receive water or water rights over every kind or nature whatsoever including …."[2] (Italics added.) Other assets listed included licenses, permits, and

---

[2]     4-S contends Sandton admitted, "by filing a UCC [financing] statement in Delaware[,] that the floodwater was personal property." The italicized language in the description of collateral shows Sandton did not attempt to categorize the water as either real or personal property. Consequently, we reject the argument that Sandton, by virtue of filing the financing statement, admitted the water seeping into the aquifer was personal property.

6.

approvals along with all rights to transport or deliver water by any means wherever located.

*Default and Bankruptcy*

In August 2018, 4-S defaulted on its obligations under the loan agreement. The parties entered into a series of forbearance agreements, the last of which expired near the end of February 2020. During the time of forbearance, Sandton obtained the October 2019 appraisal described earlier. In February 2020, 4-S failed to pay the sums due and Sandton proceeded with a nonjudicial foreclosure under the Deed of Trust.

On March 2, 2020, 4-S stopped the foreclosure by filing a voluntary bankruptcy petition under title 11 of the United States Bankruptcy Code, which invoked an automatic stay. (See 11 U.S.C. § 362(a).) Two weeks later, 4-S filed a bankruptcy schedule of assets that listed "500,000 acre-foot of stored water ($400/AC FT)" with a current value of $200 million among 4-S's personal property. The schedule's real property section listed the Land by setting forth the 17 assessor's parcel numbers and stated its value was $500 million. Thus, 4-S's bankruptcy schedule listed the stored water as personal property, not as part of 4-S's real property.

Sandton filed a motion for relief from the automatic bankruptcy stay. 4-S's opposition stated the Deed of Trust "includes a security interest in the 4-S Property's water rights" and the value of those rights was a material part of the equity analysis for determining if relief from the automatic stay was appropriate. 4-S's opposition criticized Sandton's motion for relying on an October 2019 appraisal, which stated the 5,257.46 acres had a market value of $14,985,000, because that appraisal did "not assign any value to Water Rights and only provided a value of the surface rights of the land."

4-S's opposition also asserted it was more than plausible that it could successfully reorganize within a reasonable time; the enactment of the Sustainable Groundwater Management Act in 2014 had hindered its "groundwater pumping and transfer operations"; 4-S was working to shift its operations to water storage and sales of water

inventory resulting from the intentional flooding of the Land; the Land had an extraction capacity of 50,000 acre-feet per year; and 4-S needed only one more permit from the State Water Resources Board to be fully operational

The parties' dispute over relief from the automatic stay was resolved by stipulation. The stipulation did not mention the stored water and, thus, did not characterize the nature of 4-S's rights and interests in the water. The bankruptcy court accepted the terms of the stipulation and entered an order granting relief from the automatic stay.

On March 15, 2021, 4-S filed a third amended disclosure statement in the bankruptcy proceeding. Sandton contends the document is significant to its judicial estoppel argument because the document stated the 500,000 acre-foot of stored water inventory "is appurtenant to the Property," and the "collection, storage, and sale of water is tied to the rights associated with the ownership of the Property."

*Foreclosure Sale*

The March 31, 2021 deadline established by the parties' stipulation expired without 4-S making the required payments. As a result, Sandton proceeded to enforce its rights under the Deed of Trust. The trustee sent 4-S a "Notice of Trustee's Sale" dated April 1, 2021, stating 4-S was in default under the Deed of Trust, the unpaid amount was slightly over $70 million, and the trustee's sale would be held at 12:30 p.m. on April 29, 2021, at the west entrance of the Merced County Courts Building. The notice also stated: "A public auction sale to the highest bidder … will be held by the duly appointed trustee … of all right, title, and interest conveyed to and now held by the trustee in the hereinafter described property under and pursuant to a Deed of Trust." The property was described by setting forth the legal description of the Land along with the 17 assessor's parcel numbers. The notice advised that all minerals and mineral rights were excluded. The notice did not state that the trustee's sale would include water rights appurtenant to the real estate or personal property.

8.

At the April 29, 2021 nonjudicial foreclosure sale, Sandton submitted a successful credit bid of $20 million. On May 5, 2021, a trustee's deed upon sale listing Sandton as the grantee was recorded by the Merced County Recorder. The trustee's deed stated the amount of unpaid debt was $60,856,264.58; the purchase amount paid by Sandton (the foreclosing beneficiary and grantee) was $20 million; all right, title and interest held by the trustee under the Deed of Trust in the property described thereafter was granted and conveyed to Sandton; and the conveyance was made in compliance with the terms of the Deed of Trust. The trustee's deed described the property conveyed by using the same legal descriptions and 17 assessor's parcel numbers contained in the Deed of Trust, but did not include the other items included in the Deed of Trust's definition of Property.

## PROCEEDINGS

### Sandton's Complaint

In August 2021, Sandton filed a complaint for declaratory relief seeking an order stating 4-S had no ongoing interest in the Property, including any associated water rights (regardless of how characterized), and Sandton was the rightful owner of all rights, title and interest in all water, including any water inventory in storage, relating to the Property. 4-S's answer contained a general denial and affirmative defenses, including estoppel based on Sandton's instructing its appraiser not to value the water stored below the Land, which 4-S interpreted as Sandton's concession that the stored water was not collateral for the loan. This estoppel defense refers to the October 2019 appraisal that Sandton submitted in the bankruptcy proceeding to support its motion for relief from the automatic stay.

In July 2022, Sandton filed a motion for summary adjudication of its declaratory relief claim. Sandton's moving papers asserted 4-S conveyed all water rights as part of the Property included in the Deed of Trust, the water rights constituted real property that ran with the land, and the nonjudicial foreclosure passed the water rights to Sandton.

9.

4-S's opposition papers asserted the water in question was personal property, the water had not been pledged as collateral, and the trustee's notice of sale did not reference any personal property. Based on these assertions, 4-S concluded the trustee's sale did not transfer any rights in the water to Sandton. The trial court issued a tentative decision granting the motion for summary adjudication, court heard counsel's arguments in September 2022, and took the matter under submission.

On December 19, 2022, the court filed a 27-page order granting Sandton's motion for summary adjudication of the declaratory relief cause of action. The court concluded "that, absent evidence of a physical severance of water from land, any interest or right to water that has percolated into the soil beneath a given parcel of land, is real property" and 4-S had failed to establish a triable issue of material fact as to whether the water in question had been physically severed from the Property.

*4-S's Cross-Complaint*

In September 2021, when 4-S answered Sandton's complaint, it also filed a cross-complaint. The cross-complaint's seven causes of action were challenged by Sandton in a series of demurrers. Ultimately, the trial court sustained the demurrers without leave to amend. The procedural history of the cross-complaint and the demurrers is set forth in the unpublished part III. of this opinion, which addresses 4-S arguments challenging the orders sustaining the demurrers without leave to amend.

*Appeal*

In June 2023, 4-S filed a premature notice of appeal contending the trial court had delayed entry of judgment and, as a result, made it impossible for 4-S to appeal pursuant to any category recognized in Code of Civil Procedure section 904.1, subdivision (a). In September 2023, the trial court entered judgment in favor of Sandton on its declaratory relief action and awarded Sandton $193,802.28 as reasonable attorney fees and costs. Consistent with the orders sustaining Sandton's demurrers, the judgment dismissed all the causes of action in 4-S's cross-complaint.

We exercise our discretionary authority and deem this appeal as having been taken from the September 2023 judgment.  (See Cal. Rules of Court, rule 8.104(d)(2); *Barron v. Santa Clara County Valley Transportation Authority* (2023) 97 Cal.App.5th 1115, 1122 [discretion to deem premature appeal timely].)

## DISCUSSION

### I.    WATER LAW PRINCIPLES

The following principles provide part of the legal context for our evaluation of 4-S's claims that the water in question is personal property owned by it.

#### A.    Holding Water Rights Versus Owning Water

" 'It is laid down by our law writers, that the right of property in water is usufructuary, and consists not so much of the fluid itself as the advantage of its use.' [Citation.]  Hence, the cases do not speak of the ownership of water, but only of the right to its use." (*National Audubon Society v. Superior Court* (1983) 33 Cal.3d 419, 441.) The right to use water is limited by the California Constitution "to reasonable and beneficial use[s]."  (Cal. Const., art. X, § 2; see *City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 277–278 (*Santa Maria*).)  Accordingly, holders of water rights may take and use water, but they do not own the water and cannot waste it.  (*Santa Maria*, *supra*, at p. 278.)

"[A] water right itself has been considered an interest in real property.  [Citation.] It is also sometimes described as a right 'appurtenant to' or 'part and parcel of' an interest in real property." (*State of California v. Superior Court* (2000) 78 Cal.App.4th 1019, 1025.)

Notwithstanding the foregoing principles, there is "a sense in which discrete quantities of water *can* be 'owned.'  For example, one who purchases a container of Arrowhead Puritas water then 'owns' five gallons of California water.  (See *Lewis v. Scazighini* (1933) 130 Cal.App. 722, 724, recognizing that water severed from the land

11.

becomes personal property which may be bought and sold like any other commodity.) But in its natural state, water is certainly not subject to ownership by an individual." (*State of California v. Superior Court*, *supra*, 78 Cal.App.4th at p. 1025.)

B. <u>Classifications of Water under California Law</u>

The constant circulation of water molecules on this planet is referred to as the hydrologic cycle. (Tarlock, Law of Water Rights and Resources (2024) § 2:3.) As part of this cycle, water molecules in the atmosphere condense into precipitation that falls as rain or snow and then evaporates, runs off the earth's surface into watercourses, or seeps into the ground. (*Ibid*.) "The hydrologic cycle is continuous so all sources of water are interrelated[.]" (*Ibid*.) Water law divides the continuous hydrologic cycle into discrete segments and categorizes water by its source. (*Id*., § 2:4.) The categories are artificial because the water within a category is in a temporary phase that is part of a perpetual cycle. (*Id*., § 2:3.)

This brief description of the hydrologic cycle is background for the point that water law's characterization of particular water molecules changes as those molecules move through the cycle. A nonexclusive list of the categories of water recognized by the law include (1) diffused surface water,[3] (2) stream water, (3) floodwater, (4) percolating groundwater and (5) personal property.

1. *Diffused Surface Water*

Diffused surface waters are defined by the Supreme Court as waters that "fall on the land by precipitation from the skies or arise in springs and spread over the surface of the ground without being collected into a definite body." (*San Gabriel Valley Country*

---

[3] The label "diffused surface water" is used in this opinion because the term "surface water" sometimes is defined broadly to include streams, lakes and other bodies of water. (See e.g., Wat. Code, § 1200.) The modifier "diffused" excludes other types of water on the earth's surface that are placed in different legal categories. (See generally, Dellapenna, *The Legal Regulation of Diffused Surface Water* (1991) 2 Vill. Envtl. L.J. 285, 288–292 [defining diffused surface water].)

*Club v. Los Angeles County* (1920) 182 Cal. 392, 398.)  More recently, the court stated: "Water diffused over the surface of land, or contained in depressions therein, and resulting from rain, snow, or which rises to the surface in springs, is known as 'surface water.'  It is thus distinguishable from water flowing in a fixed channel, so as to constitute a watercourse, or water collected in an identifiable body, such as a river or lake." (*Keys v. Romley* (1966) 64 Cal.2d 396, 400; see generally, *Doney v. Beatty* (1950) 124 Mont. 41, 51 [essential characteristics of diffused surface waters are short-lived flows that are not concentrated or confined in what the law recognizes as a watercourse or body of water, such as a pond or lake].)  For example, in *Galbreath v. Hopkins* (1911) 159 Cal. 297, the court determined water in a slough was diffused surface water and not water in a watercourse. (*Id*. at p. 299.)  The court stated the slough, which could be cultivated except in seasons of high water, was merely a natural depression into which surface waters gathered before flowing to the Feather River and, as such, the slough was not a watercourse. (*Ibid*.)

Diffused surface waters retain that classification "until, in obedience to the laws of gravity, they [1] percolate through the ground or [2] flow vagrantly over the surface of the land into well defined watercourses or streams." (*Everett v. Davis* (1941) 18 Cal.2d 389, 393.)  This principle illustrates how water can change legal categories, and it shows diffused surface waters lose their characterization as such when "they percolate through the ground." (*Ibid*.)

### 2. Stream Water

Once diffused "surface waters have become part of a stream in a watercourse, they are no longer recognized as [diffused] surface waters." (*Locklin v. City of Lafayette* (1994) 7 Cal.4th 327, 345.)  "A natural watercourse 'is a channel with defined bed and banks made and habitually used by water passing down as a collected body or stream in those seasons of the year and at those times when the streams in region are accustomed to

flow. It is wholly different from a swale, hollow, or depression through which may pass surface waters in time of storm not collected into a defined stream." (*Ibid.*, quoting *San Gabriel Valley Country Club v. Los Angeles County*, *supra*, 182 Cal. at p. 397.) This opinion uses the label "stream water" for water contained in what the law recognizes as a watercourse.

### 3. Floodwater

Floodwater refers to the extraordinary overflow of rivers and streams. (*Keys v. Romley*, *supra*, 64 Cal.2d at p. 400.) " 'Flood waters are distinguished from [diffused] surface waters by the fact that the former have broken away from a stream, while the latter have not yet become part of a watercourse. The term "flood waters" is used to indicate waters which escape from a watercourse in great volume and flow over adjoining lands in no regular channel, though the fact that such errant waters make for themselves a temporary channel or follow some natural channel, gully or depression does not affect their character as flood waters or give to the course which they follow the character of a natural watercourse.' " (*Mogle v. Moore* (1940) 16 Cal.2d 1, 9.) Escape from the usual channel is described as an "abnormality." (*Everett v. Davis*, *supra*, 18 Cal.2d at p. 393.) Floodwaters do not lose their legal characterization as floodwaters while flowing wild over the country. (*Mogle*, *supra*, at p. 9.)

### 4. Percolating Underground Water

The general classifications of underground waters in California are (1) the underflow of surface streams, (2) definite underground streams, and (3) percolating waters. (62 Cal.Jur.3d (2021) Water, § 368, p. 491 [classification of underground water].) Percolating waters move through the soil, do not move in an underground stream, and generally are found in a basin under the ground. (*Ibid.*) "A subsurface stream only avoids classification as percolating water if the course of the stream is known and definite." (*Ibid.*) In this appeal, we are concerned only with the water classified as

14.

percolating groundwater. No one contends the water claimed by 4-S as personal property should be classified as either the underflow of a surface stream or part of a definite underground stream.

"Courts typically classify water rights in an underground basin as overlying, appropriative, or prescriptive." (*City of Barstow v. Mojave Water Agency* (2000) 23 Cal.4th 1224, 1240.) Here, Sandton contends it is the overlying landowner and, in that capacity, holds rights to the disputed water. "The overlying right, like the riparian right, is associated with the ownership of land." (*Santa Maria*, *supra*, 211 Cal.App.4th at p. 278.)

II.     MOTION FOR SUMMARY ADJUDICATION

     A.     <u>Trial Court's Decision</u>

The trial court's order granting Sandton's motion for summary adjudication of its declaratory relief claim stated there was no factual dispute that 4-S was claiming a personal property right to floodwater allowed to percolate into the ground during the time 4-S owned the subject property. The order also stated the issue of whether the floodwater became personal property under the undisputed facts was purely a question of law.

The trial court interpreted California water law to mean a former landowner does not have an ongoing personal property interest in water that has not been severed from the land. Applying this and other legal principles, the court concluded the rights to the water associated with the Property were appurtenant to the real property (not personal property) because 4-S (1) never exercised dominion and control over the water and (2) never physically severed the water from the real property. Based on this rationale and the alternate ground of judicial estoppel barring 4-S's personal property arguments, the trial court determined Sandton was entitled to judgment as a matter of law on its declaratory relief cause of action.

The parties agree that the de novo standard of review applies to the trial court's order granting Sandton's motion for summary adjudication. In addition, their briefing raises no disputes about the existence or contents of the three-step framework used by trial and appellate courts in analyzing whether the grant of summary judgment or adjudication is appropriate. (See e.g., *Moreno v. Visser Ranch, Inc.* (2018) 30 Cal.App.5th 568, 578.) As a result, that framework need not be discussed.

B.      Issue Raised by the Parties' Contentions

4-S contends the floodwater it captured and stored before the foreclosure is personal property and, as such, the lien created by the Deed of Trust never attached to 4-S's rights or interests in the water. Stated another way, 4-S argues "the controlled flood flows over which 4-S exerted dominion and control are a personal property commodity owned by 4-S." 4-S also argues the trial court erred in concluding the water could not be personal property unless it was severed from the land, asserting: "It is unnecessary that the water be 'severed' from the real property, as ***it was never part of the real property***." Based on these arguments, 4-S concludes the trial court mischaracterized 4-S's rights or interests in the floodwater.

In contrast, Sandton contends a party's right to extract groundwater is properly characterized as a real property interest; the fact that 4-S purportedly "captured" the floodwater pursuant to easements is irrelevant; there is no evidence a specifically identifiable corpus of water was severed from the real property; and, even if the water is characterized as personal property, it was covered by the deed of trust's provision addressing water rights and, thus, was transferred with the trustee's sale.

Based on the proceedings below and the arguments presented in this appeal, the broad issue before us is whether the water claimed by 4-S is properly classified as personal property or, alternatively, 4-S's rights and interests in the water were appurtenant to the Property and ran with the land. To resolve this broad issue, we consider three

16.

specific questions of law. First, does the person capturing floodwater own the captured water as personal property. Second, assuming the captured floodwater was personal property, did the water retain the personal property classification after it was allowed to seep into the ground? Third, under California water law, can the water in question be classified as personal property when it is not severed from the real property? We answer these questions "no" for the reasons stated below.

      C.       <u>Ownership of Captured Floodwaters</u>

4-S contends that, historically, floodwater on one's land is personal property to the extent the landowner exercised control over it. To support its view of California law, 4-S quotes the following from *Dannenbrink v. Burger* (1913) 23 Cal.App. 587:

> "[I]t is well settled that where water escaping or leaking from an artificial watercourse goes to waste by flowing promiscuously over other lands or finds its way to some other stream than the one from which it is diverted into such artificial watercourse, a person appropriating such water thus merely takes the *corpus* and not the usufruct therein.… 'Time would raise no presumption of a grant nor found any claim to a continuance of the discharge …. We therefore think that the plaintiffs never acquired any right to have the stream of water continued in its former channel.' In other words, the appropriator merely secures the *corpus* of the water thus escaping as personalty, but does not thereby secure or acquire the right to the continuous flow of such water." (*Id.* at p. 596–597, original italics.)

We conclude the court's statement that the appropriator of floodwater takes or secures the corpus of the water as personalty is no longer good law. The case was decided 15 years before the amendment to the California Constitution limiting water rights "to reasonable and beneficial uses." If *Dannenbrink* were decided today, the court would state (1) the person appropriating floodwaters has the right to use the captured or diverted water (i.e., the corpus of the water appropriated), provided the use is reasonable and beneficial as required by the California Constitution and (2) the person does not acquire any right to the continuous flow of such water. In short, although capturing and controlling floodwater gives the appropriator the right to reasonable and beneficial use of

17.

the captured water, it is no longer accurate to describe the appropriator as the "owner" of the captured water. (See generally, *National Audubon Society v. Superior Court*, *supra*, 33 Cal.3d at p. 441 ["cases do not speak of the ownership of water, but only of the right to its use"]; Cal. Const., art. X, § 2.) Thus, we conclude that capturing floodwater is not enough to require the reclassification of that water as personal property.

We have not located, and the parties have not cited, any post-1928 cases explicitly defining the circumstances under which captured floodwater becomes personal property.[4] Consequently, our conclusion is based on general principles of California water law and the anomalies that would result if captured floodwaters were treated as personal property. For instance, if such floodwater was treated as personal property, it appears the water would no longer be subject to the constitutional provision that limits all water rights in California to reasonable and beneficial uses—that is, the owner could waste or otherwise use the water unreasonably. (See *Santa Maria*, *supra*, 211 Cal.App.4th at pp. 277–278.)

D.     Dominion and Control of Floodwater

Next, contrary to the foregoing legal conclusion, we assume that having dominion and control over captured floodwater is sufficient to require reclassifying the water as personal property and consider whether, in the circumstances of this case, that classification still applies. Stated another way, in light of the assumption, we consider whether 4-S retained sufficient dominion and control of the captured floodwater for it to remain classified as personal property. The relevant facts are provided by Sloan's declaration, which stated the captured water was "allowed to see[p] into the shallow aquifer underneath the 4-S Property to be stored until extraction for sale to third parties."

---

[4]     We have located authority from another western state. A Texas statute provides that storm and floodwater may be appropriated and placed in an aquifer for later removal, but when "allowed to sink into the ground, it 'loses its character and classification as storm water or floodwater and is considered percolating groundwater.' " (*Edwards Aquifer Authority v. Day* (Tex.App. 2008) 274 S.W.3d 742, 752, quoting Texas Water Code § 11.023.)

As explained below, we conclude that allowing the captured water to seep into the soil returned the water to a natural state and changed its classification to percolating groundwater. As a result, it could no longer be classified as personal property.

Once particular molecules of the water had seeped into the soil, 4-S no longer regulated or constrained what those molecules did. Rather, the law of gravity and the physical characteristics of the ground that absorbed the water determined the movement of those molecules. Although 4-S could reassert control over the captured water or its equivalent using its wells and water system to extract water, reassertion of control is not the same as maintaining control. After seeping, any personal property water joined other water in an aquifer and there is no realistic way to distinguish between what had once been personal property water and percolating groundwater. As a result, when the water claimed as personal property was absorbed into the ground and became part of the water in the aquifer, the level of dominion and control 4-S maintained over it was no greater than the dominion and control 4-S had over other water in the aquifer. Accordingly, we reject 4-S's argument that after the captured floodwater or personal property water percolated into the aquifer, it still exercised a sufficient degree of dominion and control over the water for it to be classified as personal property.

This conclusion about personal property water losing that classification when it becomes part of the water in an aquifer is compatible with basic principles of California water law. First, water "in percolation through the soil" is regarded as being in a "natural state." (*Copeland*, *supra*, 165 Cal. at p. 154; *Stanislaus Water Co. v. Bachman* (1908) 152 Cal. 716, 725 (*Bachman*).) Second, " '[w]ater in its natural state is a part of the land, and therefore *real property*.' " (*Santa Clarita Water Co. v. Lyons* (1984) 161 Cal.App.3d 450, 461]; 13 Witkin, Summary of Cal. Law (11th ed. 2017) Personal Property, § 108, p. 122 [same]; see *Copeland*, *supra*, at p. 154.) Third, water in its natural state is not subject to ownership by an individual. (*State of California v. Superior Court*, *supra*, 78 Cal.App.4th at p. 1025.) Fourth, water that has percolated into the ground loses its

19.

former classification. For example, diffused surface waters lose that classification when "they percolate through the ground." (*Everett v. Davis*, *supra*, 18 Cal.2d at p. 393.)

Moreover, if we were to create an exception to the foregoing principles and adopt a new rule of California water law that recognizes some water in an aquifer is personal property, a new body of law would need to be established to define the rights and priorities of those who own the personal property water and those who are not owners of water, but hold rights to use the other water in the aquifer. Changes of that magnitude should come from the Legislature, our Supreme Court, or by voter referendum.

To summarize, we conclude the captured floodwater, even when dominion and control was asserted after its capture, is properly classified as percolating groundwater once it seeped into the ground. It follows that the rights 4-S held in the water are defined by the principles governing percolating groundwater, not the law governing personal property.

Next, we directly address 4-S's argument that the captured floodwater "***was never part of the real property***." If this argument is treated as a conclusion of law, it is wrong for the reasons set forth above. Alternatively, if the argument is treated as an assertion of fact, it is inaccurate because, although the floodwater was not part of the real property before its capture, after it seeped into the subterranean aquifer it became physically connected to the Property. This physical connection justifies classifying it as groundwater and regarding it as part of the real property. (See *Copeland*, *supra*, 165 Cal. at p. 154 [water in percolation through the soil is part of the land].)

The foregoing conclusions do not mean 4-S lost all rights to the captured floodwater once it percolated into the ground. 4-S had the right to use the percolating groundwater in the aquifer and those rights to use would be determined by the principles of law governing percolating groundwater and its various subcategories. (See *Santa Maria*, *supra*, 211 Cal.App.4th at pp. 280, 306 [subterranean basin contained native groundwater, return flows, and salvaged water].)

E.      Severance of Water from the Real Estate

As a separate ground for the conclusion that the water in the aquifer is not personal property, we address the issue of severance. 4-S argues severance of the water from the real property is not necessary for the water to be classified as personal property. Based on Supreme Court precedent, we disagree.

In *Bachman*, *supra*, 152 Cal. 716, the court stated water in its natural situation, such "as percolations in the soil, is real property" and water "may become personalty by being severed from the land and confined in portable receptacles." (*Id*. at p. 725.) To illustrate one type of severance, the court stated water in pipes "usually retains its character as realty until severance is completed by its delivery from the pipes to the consumer." (*Id*. at p. 726.) Five years later, the court stated that water "may become personal property by being severed from the realty, but not until then." (*Copeland*, *supra*, 165 Cal. at p. 154.)

In *Copeland*, a water company argued that its water supply, which was water stored in a reservoir, was personal property that could not be appurtenant to the land. (*Copeland*, *supra*, 165 Cal. at pp. 153–154.) The company cited *People ex rel. Heyneman v. Blake* (1862) 19 Cal. 579, which stated: "The water contained in the reservoirs, and in the main and service pipes of the company, is doubtless personal property, as much so as if placed by the company in casks; and when drawn by the consumer, the quantity drawn becomes his property as by vendition." (*Id*. at p. 589.) In *Copeland*, the Supreme Court concluded it was error to state that "water becomes personalty when thus stored." (*Copeland*, *supra*, at p. 154.) The court identified the point at which the water's classification changed by stating: "Upon delivery for household use, it undoubtedly becomes personal property, being then completely severed from the realty." (*Ibid*.)

We conclude the Supreme Court's statement that water is not personal property until it is severed from the realty remains good law. In 2016, the Third District cited

21.

*Bachman* to support the following statement:  "Water in its natural state is categorized as a type of real property until severed from the realty 'and confined in portable receptacles,' at which point the water transmutes to personal property."  (*People v. Davis* (2016) 3 Cal.App.5th 708, 715.)

In 2000, the Fourth District mentioned severing water from the land.  It stated that, before the 1928 constitutional amendment, "one could speak of 'ownership' of water itself [citation], and there obviously remains a sense in which discrete quantities of water *can* be 'owned.'  For example, one who purchases a container of Arrowhead Puritas water then 'owns' five gallons of California water.  (See *Lewis v. Scazighini* (1933) 130 Cal.App. 722, 724 [recognizing that *water severed from the land becomes personal property* which may be bought and sold like any other commodity.)"  (*State of California v. Superior Court*, *supra*, 78 Cal.App.4th at page 1025, italics added.)

Here, Sloan's declaration asserted the captured water seeped into the aquifer underneath the Property, where it was stored until extraction for sale to third parties.  The Supreme Court's conclusion that water stored in a reservoir does not become personal property until it is severed from the realty (*Copeland*, *supra*, 165 Cal. at p. 154), leads us to conclude that water stored in an underground aquifer has not been severed from the realty and, as a result, is not personal property.

In summary, the trial court properly rejected 4-S's argument that the water in question was personal property water and concluded the rights to the water were "appurtenant to or part and parcel of an interest in real property."  Consequently, the court did not err when it granted Sandton's motion for summary adjudication of its declaratory relief cause of action.

22.

III.     DEMURRER TO SECOND AMENDED CROSS-COMPLAINT*

A.     Procedural History

4-S's September 2021 cross-complaint alleged causes of action that sought to set aside the nonjudicial foreclosure sale, declaratory relief, quiet title, damages for wrongful foreclosure, damages for conversion, injunctive relief, and an easement to extract 4-S's water.

The cross-complaint alleged that "beneath the surface of the 4-S real property is approximately 350,000–400,000 acre-feet of water constituting the Project Water" and asserted the legal conclusions that the water was not collateral under the loan documents, was not transferred to Sandton at foreclosure, and remained the personal property of 4-S under California water law. 4-S made the general allegation that Sandton engaged in conduct designed to suppress bidding at the foreclosure sale and, as a result, was able to purchase the Property for an amount far less than its actual value. The wrongful conduct alleged included Sandton's asserting the project water was part of its collateral, but instructing its appraiser to not assign any value to the water and then using that appraisal to support its motion for relief from the bankruptcy stay. 4-S supported the allegation that Sandton acquired the Property at far less than its value by alleging (1) Sandton's wrongful conduct allowed it to purchase the Property at the foreclosure sale for less than seven percent of the value of the project water alone and (2) Sandton subsequently listed the Property, including the project water, for sale with an asking price of $150 million, more than seven times its $20 million credit bid. 4-S alleged these circumstances justified not requiring it to tender the amount owed to Sandton as a condition for obtaining equitable relief.

In January 2022, 4-S filed an amended cross-complaint that replaced the quiet title claim with a claim to cancel the trustee's deed. After incorporating the allegations in the

---

*     See footnote, *ante,* page 1.

23.

first two causes of action, 4-S alleged the trustee's deed, which appeared valid on its face, was "invalid, void, and of no force or effect regarding [4-S's] interests in the property" and was a cloud on 4-S's title.

In March 2022, Sandton filed a demurrer to the amended cross-complaint, contending the first cause of action to set aside the nonjudicial foreclosure sale, the third cause of action to cancel the trustee's deed, and the fourth cause of action for damages caused by a wrongful foreclosure failed to allege facts sufficient to state a claim. Sandton argued (1) its filings in the bankruptcy proceeding were privileged and could not constitute wrongful conduct for purposes of the three causes of action; (2) the allegation of bid suppression did not identify any conduct occurring *at the foreclosure sale*; and (3) 4-S failed to allege it tendered the amounts due before the foreclosure sale. In April 2022, the trial court sustained the demurrer to the three causes of action with leave to amend to "either allege compliance with the tender rule or allege a legally-sufficient exception to same."

### 1. Second Amended Cross-Complaint

4-S filed a second amended cross-complaint (SACC) in October 2022—that is, after the trial court had taken Sandton's motion for summary adjudication under submission but before the court granted the motion. The SACC alleged Sandton intentionally concealed the existence of a second appraisal by Stratecon valuing the water rights that Sandton had instructed an earlier appraiser to omit from its October 2019 appraisal. The October 2019 appraisal valued the Property, without water rights, at $14,985,000 and Sandton used the appraisal to support its motion for relief from the bankruptcy stay.

The SACC also alleged Sandton intentionally (1) misrepresented to potential bidders the nature and value of the water stored at the Property; (2) avoided disclosing the existence of the water and its value by instructing the foreclosure trustee not to

24.

include personal property interests in the foreclosure sale; and (3) concealed from the foreclosure trustee the existence of the UCC Financing Statement filed at the time of the loan.

The SACC asserted 4-S was not required to tender the amount owed on the loan to obtain equitable relief because (1) Sandton's conduct was wrongful and fraudulent and (2) Sandton purchased the Property for a $20 million credit bid, which was less than seven percent of the value of the water at the time of foreclosure. To support this calculation, the SACC alleged "the value of the Project Water at the time of the trustee's sale was no less than $280,000,000.00." It explained the term "Project Water" by alleging the Property "and two adjacent properties collectively constitute approximately 7800 acres that is a fully functional underground Surface Water Storage Facility utilized for banking of surface water (hereafter the 'Project')" and these properties "act as a surface water 'water bank.' " In the cause of action to cancel the trustee's deed, the SACC alleged the deed was invalid because Sandton had full knowledge of the defects in the foreclosure sale caused by its conduct and, thus, was not a bona fide purchaser.

### 2. Demurrer to Foreclosure-Related Claims

In December 2022, Sandton filed a general demurrer to the SACC's three foreclosure-related causes of action. Sandton again asserted (1) 4-S had failed to allege state facts establishing an exception to the tender rule; (2) the allegedly wrongful conduct in the bankruptcy proceeding to obtain relief from the automatic stay, if true, was protected by the absolute privilege in Civil Code section 47; and (3) a claim based on alleged bid rigging or bid suppression was cognizable only if the actions were taken at the foreclosure sale.

4-S opposed the demurrer by asserting it had alleged facts establishing Sandton caused the irregularities in the foreclosure process that resulted in Sandton acquiring the Property at the foreclosure sale for a small fraction of its actual value and, therefore, 4-S

25.

was not required to allege it tendered the amount owed to Sandton prior to the foreclosure sale.

In reply, Sandton asserted 4-S's view of "irregularities" was contrary to California law, which requires the irregularities to take place in the context of the foreclosure proceeding. In January 2023, the trial court entered on order sustaining the demurrer to the foreclosure-related causes of action without leave to amend.

### 3. Demurrer to the Personal Property Claims

In February 2023, after the trial court granted Sandton's motion for summary adjudication, Sandton filed a demurrer to the remaining causes of action in the SACC and a motion to strike allegations within those causes of action. Sandton argued the summary adjudication order resolved the issues about ownership of interests in the water and, therefore, the remaining causes of action failed to state a claim for relief. For example, Sandton asserted 4-S's second cause of action failed because it sought a judicial declaration that (1) 4-S was the sole owner of the water in question and associated rights and (2) Sandton had no right to extract or sell any of the water.

In March 2023, the court sustained the demurrer to the second (declaratory relief), fifth (conversion), sixth (injunctive relief), and seventh (easement) causes of action without leave to amend and denied the motion to strike as moot. Based on the trial court's orders sustaining Sandton's two demurrers, the judgment filed in September 2023 dismissed all the causes of action asserted in 4-S's SACC.

### B. Claims Based on Ownership of Personal Property

4-S's appellate briefing acknowledges that some of the causes of action in the SACC are predicated on 4-S, not Sandton, owning certain floodwaters because those waters were personal property, not groundwater subject to water rights. 4-S asserts Sandton's demurrer challenging its causes of action for declaratory relief, conversion, injunctive relief, and easement was predicated on the validity of the summary

adjudication order, which "effectively eliminated any possibility of relief on those causes of action." 4-S contends the trial court erred because "4-S can state a personal property interest in the floodwaters it collected and stored on its land, and its cross-complaint stated causes of action for declaratory relief, conversion, injunctive relief, and easement."

Based on our conclusions that (1) the water in question was not personal property owned by 4-S and (2) the trial court properly granted summary adjudication of Sandton's claim for declaratory relief addressing the rights and interests Sandton held in the water, it follows that the SACC failed to state causes of action for declaratory relief, conversion, injunctive relief, or an easement. Consequently, the trial court properly sustained the demurrer to those causes of action.

## C. Claims Related to the Foreclosure

The other causes of action in the SACC seek to set aside the foreclosure sale (first), to cancel the trustee's deed upon sale (third), and to recover damages for wrongful foreclosure (fourth). 4-S asserts Sandton's demurrer to these causes of action was "primarily on the ground 4-S could not plead an exception to the tender rule required to plead wrongful foreclosure and related causes of action."

### 1. Legal Principles Governing Demurrers

A pleading must state "the facts constituting the cause of action, in ordinary and concise language." (Code Civ. Proc., § 425.10, subd. (a)(1).) Accordingly, the facts set forth in the pleading must address each essential element of the cause of action. (*Martinez v. City of Clovis* (2023) 90 Cal.App.5th 193, 253.) The essential elements are determined by the substantive law that defines the cause of action (i.e., the claim or theory of relief). (*Ibid*.)[5] When a cross-complaint "does not state facts sufficient to constitute a cause of action," a cross-defendant may object by filing a general demurrer.

---

[5] The essential elements of many causes of action are described in the Judicial Council of California Civil Jury Instructions (CACI).

(Code Civ. Proc., § 430.10, subd. (e).)  Whether a pleading alleges facts sufficient to constitute a cause of action is a question of law.  (*Martinez v. City of Clovis*, *supra*, at p. 253; *Bichai v. Dignity Health* (2021) 61 Cal.App.5th 869, 876.)

When considering an order sustaining a general demurrer, the appellate court conducts an independent review to determine whether " 'the plaintiff has stated a cause of action under any possible legal theory.' "  (*Aubry v. Tri–City Hospital Dist.* (1992) 2 Cal.4th 962, 967.)  A reviewing court gives the complaint a reasonable interpretation, reading it as a whole and its parts in their context.  (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126.)  The court treats the demurrer as admitting all material facts properly pleaded, but does not assume the truth of contentions, deductions or conclusions of law.  (*Ibid*.)  The judgment must be affirmed if any ground raised in the demurrer is well taken.  (*Aubry*, *supra*, at p. 967.)

2.        *Elements of the Causes of Action*

When a nonjudicial foreclosure sale has been completed, the traditional method for challenging the sale is a suit in equity to set aside the trustee's sale.  (*Lona v. Citibank, N.A.* (2011) 202 Cal.App.4th 89, 103.)  The essential elements of a cause of action to set aside a foreclosure sale are (1) defendants caused an illegal, fraudulent, or willfully oppressive sale of real property pursuant to a power of sale in a mortgage or deed of trust; (2) plaintiff was prejudiced or harmed; and (3) plaintiff tendered the amount of the secured indebtedness or was excused from tendering.  (*Lona*, *supra*, at p. 104; accord, *Chavez v. Indymac Mortgage Services* (2013) 219 Cal.App.4th 1052, 1062.)

These also are the elements of a wrongful foreclosure cause of action.  (See e.g., *Citrus El Dorado, LLC v. Chicago Title Co.* (2019) 32 Cal.App.5th 943, 948 [elements of wrongful foreclosure claim]; *Sciarratta v. U.S. Bank National Assn.* (2016) 247 Cal.App.4th 552, 561–561; *Chavez v. Indymac Mortgage Services*, *supra*, 219 Cal.App.4th 1062; see also, CACI No. 4920 [wrongful foreclosure–essential factual

elements].) Thus, "[a] beneficiary or trustee under a deed of trust who conducts an illegal, fraudulent or willfully oppressive sale of property may be liable to the borrower for wrongful foreclosure." (*Yvanova v. New Century Mortgage Corp.* (2016) 62 Cal.4th 919, 929.)

### 3. Exceptions to the Tender Rule

Recognized exceptions to the tender rule include (1) where the borrower's claim attacks the validity of the underlying debt (a tender would affirm the debt's validity); (2) when the borrower has a claim for money against the beneficiary and the claim, if valid, would completely offset the amount due on the underlying debt; (3) where it would be inequitable to impose the tender requirement on the borrower; (4) where the borrower's attack is based not on principles of equity but asserts the trustee's deed is void on its face; (5) when the loan was made in breach of the loan agreement or an agreement to modify the loan, or in violation of substantive law; and (6) where the borrower is not in default and there is no basis for the foreclosure. (*Turner v. Seterus, Inc.* (2018) 27 Cal.App.5th 516, 525–526 (*Turner*); CACI No. 4921 [wrongful foreclosure–tender excused].)

### 4. Case Law Cited by 4-S

4-S contends it pleaded an exception to the tender rule by alleging "a scheme before the trustee's sale that constituted unfairness and a significant difference between value and purchase price[.]" Thus, it appears 4-S relies on the equity-based exception to the tender rule stated in *Turner, supra*, 27 Cal.App.5th at page 526. 4-S supports its contention by citing three cases brought by a party other than a borrower in default seeking to set aside a trustee's deed upon sale: *Millennium Rock Mortgage, Inc. v. T.D. Service Co.* (2009) 179 Cal.App.4th 804 (*Millennium*); *Bank of Seoul & Trust Co. v. Marcione* (1988) 198 Cal.App.3d 113 (*Marcione*); and *Whitman v. Transtate Title Co.* (1985) 165 Cal.App.3d 312, 323 (*Whitman*).)

In *Whitman*, the high bidder at a trustee's sale sued the trustee, the owner of the property, and others after the trustee refused to issue the high bidder a trustee's deed. (*Whitman*, *supra*, 165 Cal.App.3d at p. 314.) The owner was a lender who had taken a third deed of trust to secure a loan and subsequently acquired the property in a foreclosure under that deed of trust. (*Id*. at p. 315.) The trial court granted the defendants' motion for summary judgment that asserted the trustee's sale was invalid. (*Id*. at p. 314.) The appellate court agreed and affirmed the summary judgment for the defendants, stating:

> "While mere inadequacy of price, standing alone, will not justify setting aside a trustee's sale, gross inadequacy of price coupled with even slight unfairness or irregularity is a sufficient basis for setting the sale aside. [Citations.] Here, the only evidence set forth in the affidavits as to the value of the property is that the property had a value of at least $65,000. Plaintiff purchased the property for $12,960. That gross inadequacy coupled with the trustee's refusal to grant the requested statutory one-day postponement constituted a more than sufficient ground for avoiding the sales and for the summary judgment in favor of defendants." (*Whitman*, *supra*, 165 Cal.App.3d at p. 323.)

Challenging this rationale, the high bidder argued the owner who requested the one-day postponement of the sale had not shown he could have obtained the funds necessary to pay the debts secured by the first and second trust deeds. (*Whitman*, *supra*, 165 Cal.App.3d at p. 322.) The court concluded such a showing was not required to uphold the invalidity of the trustee's sale because (1) the refusal of a postponement was a denial of a substantial statutory right, not a mere irregularity, and (2) the property was sold for only a fraction of its value. (*Id*. at pp. 322–323.) The court also concluded the trustee's motives for treating its sale as invalid were immaterial and, thus, did not raise a triable issue of fact. (*Id*. at p. 323.) To summarize, *Whitman* concludes a gross inadequacy in price and the failure to follow a substantial, mandatory statutory procedure are sufficient grounds to uphold a trustee's decision to invalidate the sale.

30.

In *Marcione*, a junior lienholder sued the beneficiaries and trustee under a senior deed of trust after the beneficiaries submitted a credit bid at the foreclosure sale, the trustee declared the beneficiaries the high bidder, and the trustee delivered a trustee's deed for the property to beneficiaries. (*Marcione, supra*, 198 Cal.App.3d at pp. 116–117.) The junior lienholder alleged causes of action to set aside the trustee sale, to cancel the trustee's deed, for damages for wrongful foreclosure, and for unjust enrichment. The beneficiaries filed a general demurrer, which the trial court sustained. (*Id*. at p. 117.) The appellate court reversed.

The junior lienholder had alleged the property was worth approximately $330,000, the beneficiaries acquired it for a credit bid of $107,348.63, the borrower owed the beneficiaries over $200,000 under a debt secured by the property, and therefore the junior lienholder had an equity interest in the property exceeding $130,000 and was entitled to receive any surplus from the foreclosure sale that exceeded the amount owed to the beneficiaries. (*Marcione, supra*, 198 Cal.App.3d at p. 117.) The junior lienholder had attended the foreclosure sale, was willing to bid in excess of $200,000 for the property, had a bank cashier's check for that purpose, and announced " 'we bid' " to the trustee's crier. (*Id*. at pp. 116–117.) The crier ignored the junior lienholder, did not give it an opportunity to specify its higher bid, and declared the property sold to the beneficiaries for their credit bid. (*Id*. at p. 117.)

The appellate court in *Marcione* cited *Whitman* and concluded the conduct of the foreclosure sale far exceeded "the level of 'slight unfairness or irregularity.' " (*Marcione, supra*, 198 Cal.App.3d at p. 119.) The court stated it would have taken only a few moments for the auctioneer-trustee to explain to the junior lienholder's representatives that a bid must be more specific and must exceed the amount of the prior bid. The court concluded this negligible difficulty, when compared to the detriment incurred by the junior lienholder, established the requisite level of unfairness. (*Ibid*.)

31.

In *Millennium*, the auctioneer at the foreclosure sale used the script for a different foreclosure, except he called out the address for the subject property. (*Millennium*, *supra*, 179 Cal.App.4th at p. 806.) The auctioneer opened the bidding with the $51,447.50 credit bid specified by the beneficiary from the other foreclosure, the plaintiff made a bid of $51,500, no other bids were made, and the auctioneer announced the property sold. (*Id*. at p. 807.) The plaintiff paid with a cashier's check and obtained a receipt. (*Id*. at pp. 807–808.) The subject property's beneficiary had instructed the trustee to make a credit bid of approximately $380,000. Later that day, the auctioneer discovered his mistake and telephoned the plaintiff's representative to advise him the sale was invalid due to a procedural error. The funds were returned to the plaintiff and the trustee announced its intention to hold a new sale. (*Id*. at p. 808.)

The high bidder of $51,447.50 in *Millennium* sued the trustee for failing to deliver a trustee's deed and to quiet title in the subject property. (*Millennium*, *supra*, 179 Cal.App.4th at p. 807.) The high bidder also sought a preliminary injunction enjoining the trustee from holding a new foreclosure sale for the property. The trial court granted the preliminary injunction. (*Id*. at p. 808.) The appellate court reversed and directed the trial court enter a new order denying the injunction. (*Id*. at p. 812.) Applying the principles set forth in *Whitman* and *Marcione*, the court determined an irregularity in the sale proceedings, a gross inadequacy of the price, and unfairness were abundantly present and, thus, the sale was voidable at the trustee's option. (*Millennium, supra,* at p. 811.) The gross inadequacy of price was established by the accepted bid of $51,500 being only one-seventh of the $380,000 credit bid that should have been announced for the subject property. Also, the auctioneer erred announcing the legal description of another property and the street address of the subject property. This error created an ambiguity in the sale proceeding as to which property was being auction and the contradictory property descriptions "went to the heart of the sale." (*Id*. at p. 811.) The court further concluded this error constituted an irregularity sufficient for the trustee to void the sale. (*Ibid*.) As a

result, the court reversed the grant of a preliminary injunction enjoining the trustee from conducting a new foreclosure sale.

To summarize, *Whitman*, *Marcione*, and *Millennium* applied the principle that a trustee's sale may be set aside for (1) a gross inadequacy of price and (2) an unfairness or irregularity in the sale. These cases were not commenced by a borrower in default and, thus, they had no reason to discuss the tender rule or its exceptions. For purposes of this appeal, we assume the equity-based exception to the tender rule applies when the defaulted borrower has adequately alleged (1) a gross inadequacy of price and (2) the requisite unfairness or irregularity in the sale proceedings.

### 5. *Gross Inadequacy in Price*

Here, the SACC adequately alleges a gross inadequacy in the bid accepted at the foreclosure sale. (See *Brinsmead v. Elk Grove Unified School Dist.* (2023) 95 Cal.App.5th 583, 593 [demurrer admits the truth of all material facts properly pleaded no matter how unlikely or improbable].) It alleges the value of the project water at the time of the trustee's sale was no less than $280 million and Sandton purchased the Property for a $20 million credit bid. The trustee's deed upon sale, which was attached as an exhibit, confirms the $20 million credit bid and states the amount of unpaid debt was approximately $60.9 million. Comparing the $280 million value to the $20 million credit bid, the SACC alleged Sandton purchased the Property for less than seven percent of the Property's value.

Regardless of whether the amount of the discharged debt ($60.9 million) or the amount of the credit bid ($20 million) is used in the comparison, we conclude the SACC and its exhibits set forth facts sufficient to allege a gross inadequacy between those amounts and the value of the Property transferred by the trustee's deed. (See *Whitman*, *supra*, 165 Cal.App.3d at p. 323 [gross inadequacy established where value of property

33.

sold was five times greater than the high bid at the foreclosure sale].)  The difference of over $200 million adequately pleads a gross inadequacy.

### 6. *Irregularity*

We next consider the type of irregularity needed to satisfy the principle applied in *Whitman*, *Marcione*, and *Millennium* and whether that type of irregularity has been alleged here.  In *Nguyen v. Calhoun* (2003) 105 Cal.App.4th 428, the Sixth District concluded:

> "To justify setting aside a presumptively valid foreclosure sale, the claimed irregularity must arise from the foreclosure proceeding itself.  [Citations.] A mistake that occurs outside (dehors) the confines of the statutory proceeding does not provide a basis for invalidating the trustee's sale." (*Id.* at p. 445.)

Here, the foreclosure sale is presumed valid because the trustee's deed delivered to Sandton recites that all statutory notice requirements and procedures required by law for the conduct of the foreclosure have been satisfied.  (See *Moeller v. Lien* (1994) 25 Cal.App.4th 822, 831; Civ. Code, § 2924, subd. (c).)

An example of a mistake that occurred outside the foreclosure sale proceedings is a clerical error by the beneficiary that resulted in it sending a letter instructing the trustee to open the bidding at $10,000 instead of the intended $100,000.  (*6 Angels, Inc. v. Stuart-Wright Mortgage, Inc.* (2001) 85 Cal.App.4th 1279, 1282, 1285.)  In *6 Angels*, the notice of trustee's sale listed the indebtedness at $144,656.17.  (*Id.* at p. 1282.)  The successful bidder at the foreclosure sale submitted an uncontested bid of $10,000.01.  (*Ibid.*)  When the beneficiary discovered the error, he instructed the trustee to return the bidder's funds and not to issue a trustee deed.  The bidder filed suit to quiet title and subsequently prevailed on a motion for summary adjudication of that claim.  (*Id.* at pp. 1282–1283.)  The appellate court affirmed the judgment in favor of the bidder, concluding the beneficiary's mistake in instructing the trustee of the amount of its opening bid was " 'dehors the sale proceedings.' " (*Id.* at p. 1285.)

34.

Based on the foregoing cases, we conclude the type of irregularity needed to satisfy the inadequate-price-and-irregularity doctrine is an irregularity *in the foreclosure proceedings* and the proper procedures for a nonjudicial foreclosure sale are established by statute and the terms of the deed of trust.

The only statutory irregularity described in the SACC is the failure to comply with Civil Code section 2924f, subdivision (b)(9), which requires the notice of sale to "also contain a description of the personal property or fixtures to be sold." The SACC stated the project water was personal property, and based on that legal conclusion about the water's proper classification, alleged the notice of sale and the trustee's deed were defective because they failed to describe the personal property as required by California law. We are not bound by legal conclusions set forth in a pleading. Based on our earlier conclusion that the water in question was not personal property (see III.A.3., *ante*), we conclude the statute was not violated by the failure of the notice of sale and trustee's deed to list the water in question as personal property.

The SACC does not allege Sandton or the trustee violated a procedure established by the terms of the Deed of Trust. Consequently, we conclude the SACC has not alleged an irregularity in the sale proceeding necessary to state a claim under the inadequate-price-and-irregularity doctrine.

### 7. Unfairness

The unfairness referred to in the statement that "gross inadequacy of price coupled with even slight unfairness or irregularity is a sufficient basis for setting the sale aside" (*Whitman*, *supra*, 165 Cal.App.3d at p. 323) also refers to the sale proceedings. (See *Marcione*, *supra*, 198 Cal.App.3d at p. 119 [unfairness established when trustee did not explain to junior lienholder's representatives who announce " 'we bid' " that they need to bid a specific amount higher than the opening bid].) Consequently, we consider whether

the SACC contains facts sufficient to allege the requisite unfairness in the foreclosure sale.

The wrongful conduct alleged in the SACC that could be regarded as creating unfairness includes Sandton instructing its appraiser not to assign any value to the project water, which instructions were given for the purpose of reducing the perceived value of the collateral—namely, the Property. This allegation refers to the October 2019 appraisal used by Sandton in connection with its request for relief from the automatic bankruptcy stay. The SACC does not allege any connection between the October 2019 appraisal and the April 2021 foreclosure sale, much less identify how that appraisal impacted or altered the procedures followed in conducting the sale.

The SACC also alleges Sandton intentionally concealed the existence of a second appraisal that included the value of the water rights and interests included in the Property. This allegation fails to state unfairness in the foreclosure sale because there are no factual allegations showing Sandton had any duty—statutory, contractual, or otherwise—to disclose the second appraisal to potential bidders or to the trustee. Thus, the allegations do not state how the lack of disclosure was procedurally unfair.

The SACC alleges Sandton intentionally misrepresented to potential bidders the nature and value of the water stored at the Property. California law requires claims for species of fraud, which includes intentional and negligent misrepresentation, to be pleaded with particularity. (E.g., *Lazar v. Superior Court* (1996) 12 Cal.4th 631, 645 [general and conclusory allegations do not suffice].) Thus, a pleading must set forth facts that show how, when, where, to whom, and by what means the representations were tendered. (*Ibid*.) The SACC made no attempt to allege specific facts, such as who the potential bidders were and whether the misrepresentations were made at the sale or made to potential bidders before the sale.

The SACC alleges Sandton intentionally avoided disclosing the existence of the stored water and related water rights and interests by instructing the trustee not to include

36.

personal property interests in the sale and intentionally concealing from the trustee the existence of the UCC financing statement filed at the time of the loan.  Because we have concluded the stored water was not personal property, it was appropriate for Sandton to instruct the trustee not to include the stored water as personal property being sold at the foreclosure sale and not inform the trustee of the UCC financing statement.  (See fn. 2, *ante*.)

Consequently, we conclude 4-S has not adequately alleged unfairness in the foreclosure sale proceedings.  Based on the assumption that the equity-based exception to the tender rule would apply if the SACC adequately alleged a grossly inadequate sale price and unfairness or irregularity in the sale proceedings, we conclude the SACC has failed to allege facts sufficient to constitute an excuse for not tendering the amount of secured debt before the foreclosure sale.  (See *Whitman*, *supra*, 165 Cal.App.3d at p. 323 [inadequacy of price, standing alone, will not justify setting aside a trustee's sale]; *Lopez v. Bell* (1962) 207 Cal.App.2d 394, 398 [inadequacy of price is not enough].)

E.     Leave to Amend the SACC

The January 2023 order adopted and incorporated trial court's tentative ruling, which stated:  "Although given a prior opportunity to amend, … 4-S … has not established any facts that would indicate [it] is able to allege any exception to the tender rule.  Accordingly, the demurrer is SUSTAINED WITHOUT LEAVE TO AMEND."  4-S challenges the decision not to grant leave to amend.

1.     *Basic Principles*

When a demurrer is sustained, the question of leave to amend requires the reviewing court to "decide whether there is a reasonable possibility that the defect can be cured by amendment."  (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)  If there is a reasonable probability of a cure, "the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm."  (*Ibid*.)  The burden of

demonstrating a reasonable possibility of curing the pleading's defect "is squarely on the plaintiff." (*Ibid.*; see generally, *Jameson v. Desta* (2018) 5 Cal.5th 594, 609 ["burden is on an appellant to demonstrate … an error that justifies reversal].)

"To satisfy that burden on appeal, a plaintiff 'must show in what manner he can amend his complaint and how that amendment will change the legal effect of his pleading.' [Citation.] The assertion of an abstract right to amend does not satisfy this burden. [Citation.] The plaintiff must clearly and specifically set forth ... factual allegations that sufficiently state all required elements of that cause of action. [Citations.] Allegations must be factual and specific, not vague or conclusionary." (*Rakestraw v. California Physicians' Service* (2000) 81 Cal.App.4th 39, 43–44; accord, *Rossberg v. Bank of America, N.A.* (2013) 219 Cal.App.4th 1481, 1491.)

### 2. *4-S's Showing*

4-S's appellate briefing contends the trial court did not address the deficiencies in the allegations of the second amended complaint. 4-S asserts: "The court focused on legal challenges: the court's prior decision as collateral estoppel and the legal conclusion regarding privilege. If there is a want of pleading, 4-S believes it could amend, but the court did not identify such a failure as a basis for denying leave to amend."

We conclude the trial court adequately stated the basis for its decision to sustain the demurrer without leave to amend—namely, the failure to show it could allege facts constituting an exception to the tender rule. On appeal, 4-S has not identified the additional factual allegations it could allege to plead an exception to the tender rule. Thus, we conclude 4-S has failed to carry its burden of demonstrating a reasonable probability that it could cure the defect if given leave to amend.

## DISPOSITION

The judgment is affirmed.  Sandton shall recover its costs on appeal.


FRANSON, Acting P. J.

WE CONCUR:


SMITH, J.


DE SANTOS, J.